**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| BRUNO CHIMA, | : | |
|     Plaintiff, | : | CIVIL CASE NO. |
| | : | 3:21-CV-00801 (JCH) |
| v. | : | |
| | : | |
| KX TECHNOLOGIES, LLC, | : | |
|     Defendant. | : | OCTOBER 21, 2022 |
| | : | |

**RULING ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT (DOC. NO. 27)**

## I.      INTRODUCTION

Plaintiff Bruno Chima ("Chima") brings this action against defendant KX

Technologies, LLC ("KXT"), alleging violations of Title VII and the Connecticut Fair

Employment Practices Act ("CFEPA").  Third Revised Complaint at 1–2 ("3d Revised

Compl.") (Doc. No. 1-1).[1]

On February 8, 2022, this court granted KXT's partial Motion to Dismiss (Doc.

No. 13) and dismissed Counts Five, Seven, and Eight, with leave to file an amended

complaint within fourteen days.  See Ruling on Defendant's Motion to Dismiss (Doc. No.

22).  Because Chima did not file an amended complaint, Five Counts remain: Counts

One through Four allege discrimination in violation of CFEPA and Title VII, and Count

Six alleges retaliation under CFEPA.  KXT has moved for summary judgment on all

Counts.  See Motion for Summary Judgment ("Def.'s Mot.") (Doc. No. 27);

Memorandum in Support of Motion for Summary Judgment ("Def.'s Mem.") (Doc. No.

---

[1] Because the paragraphs in the Third Revised Complaint restart at one in every Count, the court cites to the page numbers in that Third Revised Complaint.  See Notice of Removal, Ex. A at 203 (Doc. No. 1).

1

27-1); see also Reply to Plaintiff's Objection to Summary Judgment ("Def.'s Reply")

(Doc. No. 35).  Chima opposes this Motion.  See Plaintiff's Objection to Defendant's

Motion for Summary Judgment ("Pl.'s Obj.") (Doc. No. 32); Memorandum in Support of

Plaintiff's Objection to Defendant's Motion for Summary Judgment ("Pl.'s Mem.") (Doc.

No. 32-1).

For the reasons discussed below, the court grants the Motion for Summary

Judgment.

## II.   BACKGROUND[2]

### A.   Factual Background

The following facts are undisputed.  Chima began working for KXT, a "supplier of

carbon filtration and specialty media", as a temporary employee in March of 2018.

Defendant's Local Rule 56(a)1 Statement ("Def.'s R. 56(a)1 Stmt.") ¶¶ 1–2 (Doc. No.

27-2); see also Plaintiff's Local R. 56(a)2 Statement ("Pl.'s R. 56(a)2 Stmt.") ¶¶ 1–2

(Doc. No. 34-7).[3]  On the recommendation of KXT employees Christopher Thibeault

---

[2] The court draws primarily from the parties' Local Rule 56(a) Statements (hereinafter, "Rule 56(a) Statement") and supporting exhibits in summarizing the material facts, construing those facts in the light most favorable to Chima.  In violation of Local Rule 56(a), Chima's Rule 56(a) Statement does not "include a reproduction of each numbered paragraph in the moving party's Local Rule 56(a)1 Statement . . . ."  D. Conn. L. Civ. R. 56(a)2(i).  For ease of reference, the court therefore cites only to KXT's Rule 56(a)1 Statement where the statement is undisputed.

[3] Chima "dispute[s]" these first two paragraphs of KXT's Rule 56(a)1 Statement.  See Pl.'s R. 56(a)2 Stmt. ¶¶ 1–2.  The first paragraph of Chima's Rule 56(a)2 Statement lacks a citation, though even with a citation, the 'dispute' would be disregarded as a mere distinction without difference.  "[E]ach denial in an opponent's Local Rule 56(a)2 Statement[ ] must be followed by a specific citation to [either an] affidavit . . . or . . . other evidence . . . .  Failure to provide specific citations . . . may result in the Court deeming [the fact] admitted . . . ."  D. Conn. L. Civ. R. 56(a)3; see also Eiden v. McCarthy, 531 F. Supp. 2d 333, 338 (D. Conn. 2008) (deeming fact in movant's Rule 56(a) Statement "admitted" where plaintiff's denial "contain[ed] no citation whatsoever").  Chima's second Rule 56(a)2 Statement paragraph reiterates the content of KXT's corresponding one, supplementing it instead with additional information on Chima's work and educational background.  See Pl.'s R. 56(a)2 Stmt. ¶ 2.  If Chima wished to provide additional information, he should have followed the Local Rules, which state unequivocally that a:

[Rule] 56(a)2 Statement must also include a separate section entitled "Additional Material Facts" setting forth in separately numbered paragraphs . . . any additional facts, not

("Thibeault") and George Lauri ("Lauri"), KXT's Vice President of Research and Development, Rob Astle ("Astle"), "made the decision to hire Mr. Chima into . . . a full time position . . . as a design engineer" in October 2018.  Def.'s R. 56(a)1 Stmt. ¶ 3.  As a design engineer, Chima was tasked with "creat[ing] the drawings for filters and current assemblies" using Computer-Aided Design ("CAD") software, as well as "some prototyping and 3D printing."  Id. at ¶ 12.  As a member of the engineering subgroup, Chima often "coordinate[d]" with Thibeault and Lauri, "share[d] ideas", and "work[ed] together on things[,] . . . try[ing] to solve issues at the end of the day."  Id. at ¶ 14.

Lauri has a bachelor's degree in engineering and, throughout Chima's time at KXT, he worked as a product engineer.  Id. at ¶ 10.  Thibeault, too, has a bachelor's degree in engineering and worked as a senior product engineer.  Id. at ¶ 9. Lauri and Thibeault, as product engineers, led "New Product Development projects", for which they "created project plans and timelines and lead cross functional teams comprised of design engineering, process engineering, purchasing, quality, marketing and sales" utilizing the "New Product Stage Gate Process" ("NPD Stage Gate Process").  Id. at ¶ 11.[4]  Astle, as Vice President of Research and Development, "was responsible for all

---

previously set forth in responding to the movant's . . . [Rule] 56(a)1 Statement, that the [non-moving party] contends establish genuine issues of material fact . . . .

D. Conn. L. Civ. R. 56(a)2(ii).  Chima did not do so.  The second paragraph of KXT's Rule 56(a)1 Statement is therefore undisputed.

[4] Chima "dispute[s]" this, stating that "[t]hese internal structures cannot be confirmed . . . as [he] has no knowledge of such and such information was not shared with the rest of the employees."  Pl.'s R. 56(a)2 Stmt. ¶ 11.  Unlike Federal Rule of Civil Procedure 8, which permits a defendant to state that it "lacks knowledge or information sufficient to form a belief about the truth of an allegation", Fed. R. Civ. P. 56(b)(5), Local Rule 56 does not.  In this situation, Chima must either "admit[ ] or deny[ ]" KXT's Rule 56(a)1 Statement.  D. Conn. L. Civ. R. 56(a)2.  At this stage in the case, Chima "presumably has conducted discovery and should have a reasonable, factually supported basis to admit or deny any factual assertions made in the case."  Hogan v. Conn. Judicial Branch, 220 F. Supp.2d 111, 115 n.1 (D. Conn. 2002) (emphasis added).  The court assumes Chima was able to request this information in discovery because Chima has not stated otherwise.  Having examined the Affidavits cited by KXT and being "satisfied that the citation[s] . . . support[ ] the assertion", Vt. Teddy Bear Co., Inc. v. 1–800

3

new product development, product engineering, research, support services . . ., and product certifications and regulatory compliance . . . ." Id. at ¶ 6. Mr. Astle was also "required to travel frequently . . . . In fact, up to 50% of his time was spent traveling . . . to meet with KXT customers . . . as well as to [visit] KXT's manufacturing plant in Singapore." Id. at ¶ 17.[5] As a design engineer, Chima performed none of these tasks, and he was only required to travel for work twice. Id. at ¶¶ 13,[6] 21; Chima Deposition Part I ("Chima Dep. I"), Pl.'s Ex. 2 at 107:3–9, 108:12–24, 130:11–22 (Doc. No. 34-2).

Throughout his employment as a design engineer, Chima's experience with KXT seems to have been a positive one. "[N]o one . . . made any offensive comments or jokes about his race or color [as an African American man]", nor did Chima "complain to anyone at KXT[,] before or after his employment ended[,] that he believed he had been discriminated against based on his race or color." Def.'s R. 56(a)1 Stmt. ¶¶ 62–63. He left a genuine "Google review" of KXT shortly after he began working there, stating that KXT was a "[g]reat company to work for". Id. at ¶ 30. Four days before he left KXT's employ, Chima wrote a Thank You Note to KXT's Human Resource Manager saying: "The growth and management are incredible here. Keep up the good work!" Id. at ¶ 31.

---

Beargram Co., 373 F.3d 241, 244 (2d Cir.2004), the court deems the paragraph "admitted", D. Conn. L. Civ. R. 56(a)3.

[5] Chima states this is "[d]isputed in part and undisputed in part." Pl.'s R. 56(a)2 Stmt. at ¶ 17. He agrees that Astle's position required travelling, but adds that Astle had, "on multiple occasions[,] had meetings with employees from home sometimes due to family, personal/health matters, other times unknown." Id. (citing Chima Affidavit ("Chima Aff."), Pl.'s Ex. 1 ¶ 32 (Doc. No. 34-1)).

[6] Although Chima "[d]ispute[s]" this Statement in its entirety, his Rule 56(a)2 Statement only cites to (1) the same evidence as that in KXT's corresponding Statement, thereby lending support to KXT's assertion rather than providing a basis to dispute it, and (2) evidence that supports a portion of KXT's Statement that is not stated above. See Pl.'s R. 56(a)2 Stmt. ¶ 13. The court therefore deems the portion stated above to be admitted.

Outside the office, early 2020 was eventful for Chima.  He was "part of a family business, known as Chima Enterprises", for which he worked—without compensation— between ten and twenty hours per week that year.  Id. at ¶ 34.  On February 12, Chima Enterprises acquired property in Hamden, Connecticut.  Id. at ¶ 33.  For some time, however, Chima's surrogate son had been struggling with illness—something about which Chima told Thibeault, who subsequently notified Astle.  Id. at ¶¶ 35–36.  On January 22, 2020, Astle reached out to Chima directly, emailing that he had heard about Chima's home situation and asking Chima to "[p]lease let me/us know if we can support you in any way."  Id. at ¶ 36.  Chima responded that he "ha[d] to admit there [was] was a lot going on [his] end [sic]" at that time, and he asked if he could speak with Thibeault and Astle "on Friday or Monday about it" because he did not want his issues "to affect [his] work or relationship [with KXT] in any way . . . ."  Id. at ¶ 37.  This meeting led to the first of the three allegedly discriminatory actions taken by KXT against Chima.  See Pl.'s Mem at 11–12.

### 1.    Work Request

Chima, Thibeault, and Astle met on Wednesday, January 29, 2020.  Def.'s R. 56(a)1 Stmt. ¶ 41.  At the meeting, Chima "mentioned [that] he was going to be doing something with the new property acquired by Chima Enterprises", Id., and talked about his "stepson and just the complication and changes that were happening within the family dynamic."  Chima's Deposition Part II ("Chima Dep. II"), Pl.'s Ex. 3 at 143:22–24 (Doc. No. 34-2); see also Def.'s R. 56(a)1 Stmt. ¶ 41.  Chima asked that he "be allowed to work remotely (every workday for half the day)" or, in the alternative, "that his position

be converted to a part-time position."[7]  Def.'s R. 56(a)1 Stmt. ¶ 39.  Either scenario

would be temporary, but "could last as long as three to six months."  Id. at ¶ 40.[8]

      Chima attests that KXT "allowed other white/Caucasian employees in the

engineering department to work remotely namely, [ ] Lauri . . . and [ ] Thibeault".  Pl.'s

R. 56(a)2 Stmt. ¶¶ 47–49.  According to Chima, Thibeault "often would be out of the

office and work from home for health-related reasons".  In his deposition, Chima

elaborated to explain that Thibeault would be out "at least one to two days a month."

Chima Dep. II at 169:25–170:1.  When asked how long he was "alleging that [ ] Lauri

worked from home", Chima replied, "Not often at all"—"it's not the same situation as

[Thibeault]".  Id. at 172:7, 172:9–11.  Lauri had "one or two meetings that were on a

call", likely from his home.  Id. at 172:5–6.  "That was it."  Id. at 172:6.  Chima also

attests that Astle would work remotely when he was not travelling: "on multiple

occasions had meetings with employees from home sometimes due to family,

personal/health matters, other times unknown."  Pl.'s R. 56(a)2 Stmt. ¶ 17.

---

[7] Although Chima did present a part-time arrangement as an alternative to his remote work request, both KXT and Chima focus their Memoranda on the remote work option.  Chima's primary argument in favor of his claim of race and color discrimination is that KXT "denied his request to work remotely but allowed other white employees to work remotely . . . ."  Pl.'s Mem. at 11.  Considering this and the lack of argument otherwise, the court deems Chima's claims to be based on KXT's denial of Chima's remote work request rather than the alternative request to work part-time.  See, e.g., Leftridge v. New York City Dep't of Educ., No. 17CV7027, 2020 WL 1503665, at *11 (S.D.N.Y. Mar. 30, 2020) (granting summary judgment on FMLA claim because, though the plaintiff "checked the box on his Complaint for an FMLA claim[,]" it was abandoned because he made no arguments about it at the summary judgment stage).

[8] Chima admits this.  See Pl.'s R. 56(a)2 Stmt. ¶ 40.  Elsewhere, however, Chima refers to a period of one to three months, see, e.g., Pl.'s Mem. at 16; Chima Aff. ¶ 41, which contradicts, not just his Rule 56(a)2 Statement, but also his own deposition testimony, see Chima Dep. II at 151:10–14 ("Q: Isn't it true that you said this could be as long as three to six months? [Chima]: Yeah, it could be as long as three to six months in the event that, you know, things got more complicated, etc. etc")  The record on this Motion for Summary Judgment, therefore, supports a period of three to six months, as described above.  See also, Section IV.A.2.b, infra (discussing contradictions between Chima's Deposition and his Affidavit).

No decision regarding Chima's request was made at the January 29 meeting, and Chima did not speak again with Astle and Thibeault about the request until February 7, 2020.  Def.'s R. 56(a)1 Stmt. ¶¶ 42–43.  In that meeting, KXT denied Chima's requests without telling him why.  Id. at ¶ 45.  KXT instead offered Chima "the option to work part-time for the next month and [a] half until another designer was able to replace him."  Id. at ¶ 46.  Believing that Chima "intended to quit if KXT did not provide him with a work from home option or a part time role[,]" Astle told Chima "he could work part-time through the end of March, but . . . [i]f he did not want to accept that offer, then the only other option . . . was to end his employment on February 7, 2020."  Affidavit of Robert Astle ("Astle Aff."), Def.'s Ex. 3 ¶¶ 27, 29 (Doc. No. 27-5).  Chima declined, and his "employment ended" that same day.  Id.  In May 2020, KXT hired a "design engineering intern [, with a bachelor's degree in mechanical engineering,] . . . who assisted . . . with the performance of the design engineering functions until August 2020."  Def.'s R. 56(a)1 Stmt. ¶ 53 (emphasis in original).[9]  KXT hired a full-time design engineer, also with a degree in mechanical engineering, in June 2021.  Pl.'s R. 56(a) Stmt. ¶ 53.  Both the intern and the design engineer are white.  Id.

2.    Unemployment Claim

In mid-to-late February 2020, Chima filed a claim for unemployment compensation with the Connecticut Department of Labor, which was subsequently contested by KXT.  Def.'s R. 56(a) Stmt. ¶ 56.

---

[9] Chima disputes this paragraph of KXT's Rule 56(a)1 Statement, but the cited portion of his Affidavit does not contradict the portion quoted above.  See Pl.'s R. 56(a)2 Stmt ¶ 53; Chima Aff. ¶ 39. The court deems the portion above to be admitted.  See footnote 3, supra.

3.      Personnel File

In addition, on or around February 20, 2020, Chima tried to obtain a copy of his

personnel file from KXT, but he was unsuccessful.  Id. at ¶ 57.  Chima finally received a

copy of his personnel file from KXT on September 2, 2021, as a part of the initial

disclosures for the instant case.  Chima Aff. ¶ 42.

B.      Procedural Background

Chima filed a complaint with the Commission on Human Rights and

Opportunities ("CHRO") and the Equal Employment Opportunity Commission ("EEOC")

in June 2020; he received a Release of Jurisdiction on November 17 the same year.

See Ex. A to Def.'s Notice of Removal at 29 (Doc. No. 1-1).  Chima first filed this action

in Connecticut Superior Court on January 25, 2021.  Id. at 4.  After amending his

Complaint once, Chima filed a Third Revised Complaint on May 20, 2021 and, for the

first time, he brought counts against KXT arising under federal law.  See 3d Revised

Compl. at 3, 8.  Defendant removed the case to this court and subsequently moved to

dismiss Counts Five, Seven, and Eight of the Third Revised Complaint.  See Mot. to

Dismiss.

The court granted KXT's Motion on February 28, 2022, dismissing all three

Counts without prejudice with leave to file an amended Complaint within fourteen days

of the Ruling.  See Ruling Granting Mot. to Dismiss (Doc. No. 22).  Chima did not file an

amended Complaint, and the following five Counts remain: (1) discrimination on the

basis of race, in violation of CFEPA; (2) discrimination on the basis of race, in violation

of Title VII; (3) discrimination on the basis of color, in violation of CFEPA; (4)

discrimination on the basis of color, in violation of Title VII; and (5) retaliation, in

violation of CFEPA (listed as Count Six in Third Revised Complaint).  Pl.'s Mem. at 1–2;

8

see also 3d Revised Compl. at 1–10, 12–14.  KXT moved for Summary Judgment on
March 31, 2022, see Def.'s Mot., which the court now grants for the reasons set forth
below.

### III.    STANDARD OF REVIEW

A motion for summary judgment may be granted only where the moving party
can establish that "there is no genuine dispute as to any material fact and the movant is
entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); see also Anderson v.
Liberty Lobby, Inc., 477 U.S. 242, 256 (1986); Wright v. N.Y. State Dep't of Corr., 831
F.3d 64, 71-72 (2d Cir. 2016).  If the moving party satisfies this burden, the nonmoving
party must set forth specific facts demonstrating that there is indeed "a genuine issue
for trial."  Wright v. Goord, 554 F.3d 255, 266 (2d Cir. 2009).  A genuine issue exists
where "the evidence is such that a reasonable jury could return a verdict for the
nonmoving party."  Cross Commerce Media, Inc. v. Collective, Inc., 841 F.3d 155, 162
(2d Cir. 2016).  Unsupported allegations do not create a genuine dispute of fact and
cannot overcome a properly supported motion for summary judgment.  See Weinstock
v. Columbia Univ., 224 F.3d 33, 41 (2d Cir. 2000).  Nor can "[c]onclusory assertions in
affidavits[,] generally insufficient to resolve factual disputes", create disputes to bar
summary judgment where none otherwise exist.  Allen v. Coughlin, 64 F.3d 77, 80 (2d
Cir. 1995) (emphasis added).  In assessing the record to determine whether there are
disputed issues of material fact, the trial court must "resolve all ambiguities and draw all
inferences in favor of the party against whom summary judgment is sought."  LaFond v.
Gen. Physics Servs. Corp., 50 F.3d 165, 175 (2d Cir. 1995).

## IV.   ANALYSIS

In Counts One through Four, Chima argues that KXT discriminated against Chima, on the basis of race and color in violation of Title VII and CFEPA, by (1) denying his request for an alternative work arrangement, leading to his termination; (2) challenging his application for unemployment benefits; and (3) failing to timely provide his Personnel Record when Chima requested it.  See generally 3d Revised Compl.  The failure to provide Chima's Personnel Record in a timely manner is also claimed in Count Six, wherein Chima argues retaliation in violation of CFEPA.  Id.  KXT moves for summary judgment on all five Counts.

A.   Counts One through Four: Race and Color Discrimination

Chima argues that KXT discriminated against him, based on his race and color, in violation of Title VII and CFEPA.  While Chima describes three instances of alleged discrimination in his Memorandum, he also explains that his "chief complaint and/or claim" is that KXT "discriminated against him when KXT denied his request to work remotely temporarily . . . but allowed three other Caucasian or white employees . . . to work remotely."  Pl.'s Mem. at 2.  "Also," Chima continues, "he was forced to resign, and/or was constructively discharged after his request to work remotely was denied." Id.  The other two instances of discrimination occurred when KXT "failed to produce and/or provide a copy of his personnel file" and "contested his unemployment compensation . . . on a false allegation that [Chima] voluntarily quit his job while in fact he was constructively discharged."  Id. at 3.  KXT argues, inter alia, that Chima's claims fail for three reasons: (1) Chima "cannot establish an adverse employment action to support a prima facie case of discrimination under Title VII and CFEPA"; (2) "no reasonable jury could find that any one of [the three instances described above]

10

occurred under circumstances that give rise to an inference of discriminatory intent" as

the fourth element of Chima's <u>prima facie</u> case requires; and (3) Chima "cannot

demonstrate that KXT's legitimate non-discriminatory reasons for its response to

[Chima]'s request . . . were pretext for race or color discrimination."  Def.'s Mem. at 2.

  Chima and KXT agree that Title VII and CFEPA claims are analyzed under the

same framework.  <u>See</u> Def.'s Mem. at 10; Pl.'s Mem.;[10] <u>see also</u> <u>Vasquez v. Claire's</u>

<u>Accessories, Inc.</u>, 392 F.Supp.2d 342, 349 (D. Conn. 2005) ("CFEPA claims are

analyzed in the same manner as Title VII employment discrimination claims.").  Title VII

prohibits employers from discriminating against any individual because of that

individual's race, color, religion, sex, or national origin.  42 U.S.C. § 2000e-2(a)(1).

Thus, "[a]n employment decision . . . violates Title VII when it is based in whole or in

part on discrimination."  <u>Holcomb v. Iona Coll.</u>, 521 F.3d 130, 137 (2d Cir. 2008)

(internal quotation marks omitted).  To withstand a motion for summary judgment, a

Title VII claim of employment discrimination must survive the three-part burden-shifting

test established in <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792 (1973).  <u>See</u>

<u>Walsh v. New York City Hous. Auth.</u>, 828 F.3d 70, 74-75 (2d Cir. 2016).  Under the

<u>McDonnell Douglas</u> framework, "a plaintiff must first satisfy an initial burden of proving

by the preponderance of the evidence a <u>prima facie</u> case of discrimination."  <u>Robinson</u>

<u>v. Concentra Health Servs.</u>, Inc., 781 F.3d 42, 45 (2d Cir. 2015) (citation and internal

quotations omitted).  A plaintiff may establish a <u>prima facie</u> case of discrimination by

---

[10] Chima's Opposition Memorandum does not separately address the standard under CFEPA and applies only a Title VII framework to the four counts from the Third Revised Complaint.  <u>See generally</u> Pl.'s Mem.  Because the standard is the same under both, the court analyzes Chima's claims under both statutes rather than considering the CFEPA claims abandoned.

demonstrating that (1) they were within a protected class; (2) they were qualified for the position sought or held;[11] (3) they were subject to an adverse employment action; and (4) the adverse action occurred under circumstances giving rise to an inference of discrimination.  See Walsh, 828 F.3d at 75.

Once the plaintiff has met the minimal burden of stating a prima facie case, the burden shifts to the employer to articulate some legitimate, nondiscriminatory reason for the adverse employment action.  Id.  This burden is "not a demanding one", and it requires only "an explanation for the employment decision" supported by evidence that, taken as true, would permit the conclusion that the reason for the decision was non-discriminatory.  Bickerstaff v. Vassar College, 196 F.3d 435, 446 (2d Cir. 1999).

If the employer meets this burden of production, the burden shifts back to the plaintiff, who must then prove that the employer's proffered reason was a pretext for discrimination.  McPherson v. New York City Dept. of Education, 457 F.3d 211, 215 (2d Cir. 2006).  This requires the plaintiff to submit evidence to "show circumstances that would be sufficient to permit a rational finder of fact to infer that the defendant's employment decision was more likely than not based in whole or in part on discrimination."  Walsh, 828 F.3d at 75 (citation omitted).

1.      Adverse Employment Actions

In his Objection to Summary Judgment, Memorandum and Rule 56(a)2 Statement (hereinafter, "Opposition Materials"), as well as in his Third Revised Complaint, Chima argues that all three events—that is, KXT's (1) denial, which

---

[11] For the purposes of its Summary Judgment Motion only, KXT does not challenge these first two elements of Chima's prima facie case.  Def.'s Mem. at 12 n.5.

encompassed Chima's termination, of Chima's work request; (2) challenge to his application for unemployment benefits; and (3) failure to timely produce his personnel record after his employment ended—constitute adverse employment actions for the purposes of his discrimination counts.  For the reasons that follow, the court holds that only the first event qualifies.

In order to establish an adverse employment action to satisfy the third element of his prima facie case, Chima must come forward with evidence suggesting that he suffered "a materially significant disadvantage with respect to the terms of [his] employment."  Littlejohn v. City of New York, 795 F.3d 297, 312 n.10 (2d Cir. 2015) (emphasis in original) (quoting Williams v. R.H. Donnelley Corp., 368 F.3d 123, 128 (2d Cir. 2004)).  An adverse employment action is "more disruptive than a mere inconvenience or an alteration of job responsibilities."  Id. (quoting Galabya v. N.Y.C. Bd. of Educ., 202 F.3d 636, 640 (2d Cir. 2000)).  "Examples of materially significant disadvantages include termination, demotion, a less distinguished title, a material loss of benefits, or significantly diminished material responsibilities."  Id. (internal quotation marks and alterations omitted) (quoting Galabya, 202 F.3d at 640); see also Amato v. Hearst Corp., 149 Conn. App. 774, 781, (2014) ("An adverse employment action [, for purposes of a CFEPA claim of discrimination, includes] as a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits.") (internal quotations and citations omitted).

Chima argues that KXT's denial of his request, "with the mandate that[,] if [he] did not accept [KXT]'s refusal, his employment would be terminated and subsequently was

terminated, was a clear and undisputed adverse employment action as a matter of law
. . . ."  Pl.'s Obj. at 2 (emphasis added).[12]  While KXT argues that "the denial of
[Chima]'s request to work remotely meant that his terms and conditions would remain
the same, and he would be required to continue working from the office as he had all
throughout his employment",  Def.'s Mem. at 13, this is contradicted by Astle's Affidavit,
see Astle Aff. ¶ 27 (stating that Chima had the option of either "work[ing] part time
through the end of March," or "end[ing] his employment" that very day).  Thus,
construing the facts cited on the record in the light most favorable to Chima, KXT did not
give Chima the option to remain in his position with the same terms and conditions
when KXT denied his remote work request.  Rather, a reasonable juror could find that
KXT denied Chima's request and offered him only two choices: to stay on, part time,
until a replacement was found, or to stop work immediately.  See Def.'s R. 56(a)1 Stmt.
¶ 46; see also Chima Aff. ¶¶ 21, 41; Astle Aff. ¶ 27.  The jury could, therefore, find that
KXT's response to Chima's request was termination: the only question was whether it
would occur on February 7, 2020, the day KXT gave its final offer in response to
Chima's request, or at "the end of March 2020."  Astle Aff. ¶ 27.

        Termination is indisputably an adverse action for the purposes of a Title VII and
CFEPA claim.  Therefore, the court concludes that KXT's denial of Chima's work
request and Chima's subsequent termination (hereinafter, collectively called "KXT's
Denial") satisfies the third element of Chima's prima facie case.

_____

        [12] Chima also argues, apparently in the alternative, that the combination of the denial and
'mandate' described above "constituted a constructive discharge."  See Pl.'s Mem. at 3.  Because the
court concludes that a reasonable juror could find KXT effectively terminated Chima when it denied his
request, the court does not address whether the denial could also be construed as a constructive
discharge.

The same is not true, however, for the two other two employment actions Chima claims were discriminatory.  Both KXT's delayed provision of Chima's personnel file and its challenge to Chima's application for unemployment benefits occurred after Chima's employment with KXT ended.  KXT argues that "post-employment allegations cannot form the basis of an adverse employment action" at all.  Def.'s Mem. at 16.  The court agrees.

Indeed, while Title VII and CFEPA certainly apply to adverse employment actions taken during the period of employment—including the hiring and termination itself—both statutes are "silent about actions taken after the employer-employee relationship is severed by termination."  Rogers v. Makol, No. 3:13-CV-946 JAM, 2014 WL 4494235, at *4 (D. Conn. Sept. 10, 2014) (holding that the defendants' opposition to and appeal of the plaintiff's unemployment benefits were "not an adverse employment action within the scope of the anti-discrimination prohibitions of Title VII . . . because they occurred after plaintiff's employment was terminated").[13]  To this court's knowledge, the Second Circuit has not spoken directly on the discrete issue of whether a pure discrimination claim—as opposed to a retaliation claim—can arise from post-termination conduct. However, the Circuit has not foreclosed the possibility: although a Title VII retaliation case, the Second Circuit did consider the language of Title VII's prohibition on discrimination in Pantchenko v. C.B. Dolge Company.  581 F.2d 1052 (2d Cir. 1978). There, the Court explained that, while Title VII's use of the word 'employee,' if "[r]ead literally[. . . ,] may be construed . . . to require that an employment relationship exist at

---

[13] This is different from Title VII retaliation cases, wherein post-employment actions can sometimes qualify as adverse employment actions under the statute.  See, e.g., Mira v. Kingston, 218 F. Supp. 3d 229, 235 (S.D.N.Y. 2016), aff'd, 715 F. App'x 28 (2d Cir. 2017).

the time of the challenged conduct [, . . . such a narrow construction would not give effect to the statute's purpose" of remedying employers' use of discrimination "in connection with a prospective, present or past employment relationship to cause harm to another."  Id. at 1054-55.  The Court thus declared generally that "Title VII prohibits discrimination related to or arising out of an employment relationship, whether or not the person discriminated against is an employee at the time of the discriminatory conduct." Id. at 1055.

Fortunately, in this case the court need not determine whether the Second Circuit intended its statement in Patchenko to apply to post-employment actions in non-retaliatory discrimination claims.  In his Opposition materials, Chima not only failed to respond to KXT's argument that KXT's challenge to his unemployment application did not constitute an adverse action because it occurred after his employment ended: Chima also failed to argue KXT's unemployment challenge qualified as an independent adverse action at all.  See generally Pl.'s Obj.; Pl.'s Mem.  "[I]n the case of a counselled party, a court may, when appropriate, infer from a party's partial opposition that relevant claims or defenses that are not defended have been abandoned."  Jackson v. Federal Express, 766 F.3d 189, 197 (2d Cir. 2014).  The court thus concludes that Chima's claim that KXT violated Title VII and CFEPA by challenging Chima's unemployment application was abandoned.  It therefore does not constitute an adverse action and cannot support a separate claim of discrimination.

Finally, although Chima may have initially claimed that KXT's late provision of Chima's personnel record constituted an independent instance of discrimination in his Third Revised Complaint, he does not do so at this stage in the proceedings.  See Pl.'s

Obj.  In his Opposition Memorandum, Chima argues that the personnel file issue is merely "a continuation of the defendant's original action and refusal to allow [him] to work remotely just for temporarily for [sic] a limited or brief time . . . ."  See Pl.'s Mem. at 17.  The court therefore treats this event as a part of KXT's Denial rather than a separate claim of discrimination.

In sum, Chima has satisfied the third element of his prima facie case only with regards to KXT's Denial.

### 2.      Inference of Discriminatory Intent: Disparate Treatment

KXT next argues that Chima has not come forward with evidence suggesting that any alleged adverse employment action occurred under circumstances raising an inference of discriminatory intent.  See Def.'s Mem at 19–28.  Chima's response is conclusory at best, arguing that "there is circumstantial evidence that allows for the reasonable inference of discrimination" because "Caucasian co-workers . . . were allowed to work remotely, [while Chima] was not."  Pl.'s Mem. at 18.  In comparing his treatment to that of Lauri, Thibeault, and Astle, Chima argues that "he was treated less favorably than other similarly situated employees outside his race and color", thereby "satisfy[ying] the burden of establishing [his] prima facie case . . . ."  Id.

A plaintiff can raise "an inference [of discriminatory intent] by showing that the employer subjected him to disparate treatment, that is, treated him less favorably than a similarly situated employee outside his protected group."  Graham v. Long Island R.R., 230 F.3d 34, 39 (2d Cir. 2000).  Chima, however, has failed to come forward with evidence upon which a reasonable juror could that Chima was subject to disparate

treatment because Chima was not similarly situated to any of the employees Chima
names in his arguments.

### a.  Similarly Situated KXT Employees

KXT states that the "only alleged evidence of disparate treatment [that] Chima
points to was his [ ] allegation that Mr. Astle, Mr. Thibeault, and Mr. Lauri were allegedly
allowed to work remotely when he was not."  Def.'s Mem. at 20.  KXT argues that, at a
minimum, Astle and Thibeault were not similarly situated to Chima.  Id.  In his
Opposition materials, Chima makes no argument regarding whether Astle, Thibeault, or
even Lauri are similarly situated to him.  See generally Pl.'s Mem.

"[W]here a plaintiff seeks to establish the minimal prima facie case [of
discrimination] by making reference to the disparate treatment of other employees," it is
necessary that those employees "have a situation sufficiently similar to [the] plaintiff's to
support at least a minimal inference that the difference of treatment may be attributable
to discrimination."  McGuinness v. Lincoln Hall, 263 F.3d 49, 54 (2d Cir. 2001).  A
plaintiff relying on disparate treatment evidence "must show [he] was similarly
situated in all material respects to the individuals with whom [he] seeks to compare
[him]self." Id.  An employee is similarly situated to co-employees if they were (1)
"subject to the same performance evaluation and discipline standards" and (2)
"engaged in comparable conduct."  Ruiz v. Cty. of Rockland, 609 F.3d 486, 493–94 (2d
Cir. 2010).  "[T]he standard for comparing conduct requires a reasonably close
resemblance of the facts and circumstances of plaintiff's and comparator's cases, rather
than a showing that both cases are identical."  Id. at 494.  While the question as to
whether employees are similarly situated is generally one of fact, a court may properly
grant summary judgment "where no reasonable jury could find the similarly situated

prong met." See Dellaporte v. City Univ. of New York, 998 F. Supp. 2d 214, 230 (S.D.N.Y. 2014).

Chima has not come forward with evidence upon which a reasonable juror could find that he was similarly situated "in all material respects" to Astle, Thibeault, or Lauri. Thibeault and Lauri were product engineers, whose positions required them to "create[ ] project plans and timelines and lead cross functional teams comprised of design engineering, process engineering, purchasing, quality, marketing and sales . . . ." Def.'s R. 56(a)1 Stmt ¶ 11. Astle, as Vice President of Research and Development, "was responsible for all new product development, product engineering, research, support services", and compliance issues. Id. at ¶ 6.  Although Chima frequently worked with Thibeault and Lauri to solve common problems, his position as a design engineer was focused on "creat[ing] the drawings for filters and current assemblies" using CAD software, with "some prototyping and 3D printing" as well.  Id. at ¶ 12.  Chima was able to do his position without a bachelor's degree, while both Lauri and Thibeault had engineering degrees.  Pl.'s R. 56(a)2 Stmt ¶ 2; Def.'s R. 56(a)1 Stmt. ¶¶ 9–10.

As an employee with a different educational background, different job title, and different duties, Chima is not similarly situated with either Astle, Thibeault, or Lauri. See, e.g., Cooper v. Morgenthau, No. 99 CIV. 11946 (WHP), 2001 WL 868003, at *7 (S.D.N.Y. July 31, 2001) (concluding that plaintiff and co-worker were not similarly situated because they held different positions and did not share common job descriptions).  These differences are particularly critical in this case because KXT's alleged reason for denying Chima's work request was that it anticipated a "new project from a key client" which would require "significant design engineer work", and Chima

19

appears to have been the only design engineer at the time able to do his position.  See Def.'s R. 56(a)1 Stmt. ¶ 53 (asserting that Chima's departure left KXT without a "single employee available to take on the design engineer functions" so the "duties previously performed by Mr. Chima had to be shared by more than one employee").[14]  Because Chima has come forward with no evidence of any other design engineers, this difference in job title—design engineer versus product engineers and Vice President—is material.  No reasonable juror could find that Chima, as the only design engineer, was similarly situated to the product engineers and the Vice President, such that the alleged "difference of treatment may be attributable to discrimination."  McGuinness, F.3d at 54.

In light of the above, the court concludes that Chima has failed to come forward with evidence upon which a reasonable juror could find that he was similarly situated to any of the individuals that Chima alleges were permitted to work remotely.  However, this conclusion is particularly clear with respect to Astle.  At a minimum, no reasonable juror could find that Astle, as Vice President of Research and Development at KXT, was not similarly situated to Chima in all material respects.  Indeed, in Chima's Deposition, even Chima acknowledged that Astle's job duties justified Astle's ability to work

---

[14] In his Rule 56(a)2 Statement, Chima disputes this paragraph by citing to his own Affidavit, which states that KXT "hired a white male . . . to replace and take [Chima's] position as a design engineer after terminating [Chima's] employment[.]"  Pl.'s R. 56(a)2 Stmt. ¶ 53; Chima Aff. ¶¶ 27, 39.  Chima attests in his Affidavit that KXT replaced him with an intern "[i]mmediately after termination of [his] employment," but in the same paragraph Chima also acknowledges that this intern's LinkedIn page reflects a May 2020 start date.  Id. at ¶ 27.  KXT similarly states that it hired the intern in May 2020, three months after Chima was terminated.  Def.'s R. 56(a) Stmt ¶ 53.  Even taking Chima's claim that this intern replaced Chima as true, there are still three months during which KXT claims to have split Chima's duties among its employees.  Chima has come forward with no evidence contradicting this, and he lacks the requisite personal knowledge to rebut this fact through his own Affidavit because Chima was no longer working for KXT at that time.  The court therefore treats KXT's Rule 56(a)1 Statement, at least with respect to the first three months after Chima's termination, as undisputed.

remotely while Chima's request to do the same was denied: "[a]t the end of the day, [Astle]'s a higher level executive and I can understand that."  Chima Dep. 171:4–8.

Because no reasonable juror could find that Astle was similarly situated to Chima, any disparate treatment between Astle and Chima, in terms of remote work ability, cannot form a basis for a reasonable juror to infer discriminatory intent in KXT's Denial.  The court views it as highly unlikely that a reasonable juror could find that Lauri and Thibeault were similarly situated to Chima either, but in the interest of being thorough and resolving ambiguities in Chima's favor, it nonetheless proceeds with the disparate treatment analysis with respect to Thibeault and Lauri, only.

### b.  Less Favorable Treatment

Chima has failed to raise an inference of discrimination because he has not come forward with admissible evidence upon which a reasonable juror could find that he was treated less favorably than Lauri or Thibeault.  Indeed, KXT has come forward with admissible evidence in support of its position that none of Chima's co-workers were permitted, at any time during the workday, to work from home unless they were travelling or working outside regular business hours.  See, e.g., Astle Aff. ¶¶ 21, 24; Affidavit of Christopher Thibeault ("Thibeault Aff."), Def.'s Ex. 4 ¶ 11 (Doc. No. 27-6); Affidavit of George Lauri III ("Lauri Aff."), Def.'s Ex. 5 ¶ 9 (Doc. No. 27-7).  Chima's proffered evidence to the contrary comes from his own statements: Chima's Affidavit, Chima's Deposition, and even Chima's Third Revised Complaint.  See Pl.'s Mem. at 6–7 (citing Chima Aff. ¶¶ 5–6, 38), 11–12 (citing Chima Dep. II at 161:15–164:3; 3d Revised Compl. at 1–2), 14–15 (citing Chima Aff. ¶¶ 5–6, 21–22, 38), 18–20 (citing Chima Aff. ¶¶ 5, 6, 33, 38), 22–23; Pl.'s R. 56(a)2 Stmt. ¶¶ 47–49 (citing Chima Aff. ¶

38), 51 (citing Chima Aff. ¶¶ 5–6), 60 (citing Chima Aff. ¶ 5); see also Pl.'s Mem. at 2–3 (no citations provided); Pl.'s R. 56(a)2 Stmt. ¶ 24 (no citation provided).

"[F]or summary judgment purposes, '[a] supporting or opposing affidavit must be made on personal knowledge.' . . .  [This] requirement . . . is not satisfied by assertions made 'on information and belief.'" Patterson v. County of Oneida, N.Y., 375 F.3d 206, 219 (2d Cir. 2004) (internal citations omitted).  To survive KXT's Motion, Chima "must do more than vaguely assert the existence of some unspecified disputed material facts or 'rely on conclusory allegations or unsubstantiated speculation.'" Foley v. Town of Malborough & Amy Traversa, No. 3:19-CV-01481 (VAB), 2022 WL 3716505, at *14 (D. Conn. Aug. 29, 2022) (quoting Robinson v. Concentra Health Servs., Inc., 781 F.3d 42, 44 (2d Cir. 2015)).  However, a close look at Chima's Opposition materials confirms that Chima has not met this burden: his Affidavit and his Deposition are replete with statements that are either conclusory, vague, unsupported, or lacking sufficient personal knowledge to raise a genuine issue of material fact.

For instance, Chima insists repeatedly in both his Affidavit and his Opposition materials that Astle, Lauri, and Thibeault were all permitted to work remotely when he was denied permission to do the same.  See, e.g., Chima Aff. ¶¶ 5, 19, 32–33, 35, 38; Pl.'s Obj. at 2; Pl.'s Mem. at 2–3, 6–7, 10, 14–15, 18–20, 23; Pl.'s R. 56(a)2 Stmt. ¶¶ 47–48.  Yet, in his Deposition, Chima was unable to specify how he knew that Thibeault, for example, had worked from home.  See Chima Dep. at 167:22–168:1. Indeed, Chima "d[id] not know" whether he had ever been in a "Zoom meeting with . . . Thibeault when [Thibeault] was sitting at his house" because Chima lacks any personal knowledge about "what [Thibeault]'s house looks like."  Id.  Nor was Chima able to state

with certainty whether Thibeault's laptop was even set up to work remotely.  Id. at

168:6–10.  Chima's Deposition answers were similarly uncertain with regards to Lauri.

See id. at 171:17–172:11.

KXT, on the other hand, has come forward with the Affidavits of both Thibeault

and Lauri, which directly contradict Chima's sworn statements.  Thibeault swears that,

throughout Chima's employment at KXT, "[a]t no time . . . did [he] work remotely, other

than when [Thibeault] had to occasionally travel for business, or when he had to

occasionally take calls outside normal business hours . . . with other coworkers located

in Singapore or India."  Thibeault Aff. ¶ 11.  Lauri's Affidavit swears the exact same

thing about Lauri.  Lauri Aff. ¶ 9.[15]

"When opposing parties tell two different stories, one of which is blatantly

contradicted by the record, so that no reasonable jury could believe it, a court should

not adopt that version of the facts for purposes of ruling on a motion for summary

judgment."  Leeber Realty LLC v. Trustco Bank, 316 F. Supp. 3d 594, 609 (S.D.N.Y.

2018) (citing Scott v. Harris, 550 U.S. 372, 380 (2007)).  Chima simply does not have

the requisite personal knowledge or discovered evidence to create a genuine dispute of

material fact as to whether KXT actually permitted Thibeault or Lauri—much less any

other, unspecified, white employees—to work remotely.  See, e.g., Shumway v. United

Parcel Serv., Inc., 118 F.3d 60, 64 (2d Cir. 1997) (affirming summary judgment, on the

basis of insufficient evidence "to demonstrate that [defendant employer] treated similarly

situated [employees] differently", where plaintiff "admit[ted] that she has no personal

---

[15] KXT did not come forward with affidavits of any other employees.  However, additional
affidavits would not be necessary, given that Chima did not identify anyone other employees, or any
specific instances, in his Third Revised Complaint or Opposition materials.

knowledge of the alleged violations but heard about them because they were 'common knowledge'").

Chima's statements regarding his own history of working remotely for KXT—something about which Chima clearly would have personal knowledge—also fail to raise a genuine dispute of material fact about whether KXT had permitted employees to work remotely before it denied Chima's request.  In his Deposition, for example, Chima testified that he "believe[d he] would have brought [his] laptop home" to work remotely when he took vacation time.  Chima Dep. II at 173:1–4.  However, when KXT's counsel sought a more specific answer by asking whether Chima "believe[d] or [he] kn[e]w [he] took it home[,]" Chima replied: "I don't know.  I don't remember.  It was two years ago."  Id. at 173:2–7.  This uncertainty disappeared, however, in Chima's Affidavit, in which Chima now swears that he, "prior to [being terminated], would . . . work remotely when out of [the] office, on trips, or in extenuating circumstances."  See Chima Aff. ¶ 16.

A district court is "entitled to disregard . . . new testimony" when it appears a party is attempting to "defeat[ ] summary judgment simply by submitting an affidavit that contradicts the party's previous sworn testimony."  In re Fosamax Prod. Liab. Litig., 707 F.3d 189, 193 (2d Cir. 2013) (internal citation omitted).  In this Circuit, the permission to "disregard[ these sorts of] purported issues of fact" only arises in the "rare circumstance where the plaintiff relies almost entirely on his own testimony, much of which is contradictory and incomplete, and where the facts alleged are so contradictory that doubt is cast upon their plausibility[.]"  Rojas v. Roman Catholic Diocese of Rochester, 660 F.3d 98, 100 (2d Cir. 2011) (per curiam) (internal quotations, alterations, and citations omitted).  The court need not determine whether the inconsistencies between

24

Chima's Affidavit and his prior Deposition testimony rise to such a level in this case, however, because the sworn statement in Chima's Affidavit lacks specificity to raise a genuine issue of fact as to KXT's remote work policy.  See, e.g., Lawson v. Avis Budget Car Rental, LLC, 194 F. Supp. 3d 301, 309 n.9 (S.D.N.Y. 2016) (granting employer's summary judgment where, "to the extent the statements in [the plaintiff]'s affidavit could be construed as not contradicting her earlier deposition testimony, the statements [were] still insufficient to create a genuine issue of material fact" because, inter alia, she did not "provide any facts or explanation to support the allegation that [her supervisor] had 'effectively' locked her out of the office"), aff'd in part, vacated in part, remanded sub nom. Lawson v. Homenuk, 710 F. App'x 460, 463 n.1 (2d Cir. 2017) ("the assertions presented in the affidavit are . . . insufficient to create a triable issue of fact, because they lack specificity and include elements of speculation"), and on reconsideration sub nom. Lawson v. Homernuk, No. 15 CIV. 1510 (GBD), 2018 WL 2081914 (S.D.N.Y. Apr. 24, 2018).

Even if, however, the court did accept Chima's Affidavit as sufficient to create a genuine dispute of material fact as to whether his white co-workers were permitted to work remotely, Chima has still failed to raise an inference of discrimination in this case. Crediting all of Chima's statements as true and sufficiently specific, Chima has, at best, come forward with evidence suggesting that some employees only occasionally worked from home—Chima has come forward with no evidence suggesting that any employee worked under the particular conditions he requested.  Chima did not receive less favorable treatment by being denied a work arrangement that no one else had.  Indeed, at his most specific, Chima swore in his Deposition that Thibeault was out of the office,

at most, two days a month, Chima Dep. II at 169:25–170:1, and he provided no frame of reference for the Lauri's remote work history except to say that Lauri's "was not the same situation as [Thibeault]'s" and that Lauri did "[n]ot [work from home] often at all[,]" Id. at 172:7–11.  Working from home for a maximum of two days a month is a far cry from working remotely "every workday for half the day" for up to three to six months. Def.'s R. 56(a)1 Stmt. ¶¶ 39–40.

In sum, Chima has failed to come forward with evidence upon which a reasonable juror could find that KXT treated Chima less favorably than any similarly situated KXT employees.  Chima's proffered evidence, therefore, does not support a reasonable inference that KXT's Denial[16] was made with discriminatory intent, and Chima's prima facie case fails at the fourth element.

The court therefore grants KXT's Motion for Summary Judgment on Counts One through Four of Chima's Third Revised Complaint.

B.     Count Six: Retaliation under CFEPA

In Count Six, Chima claims that KXT retaliated against him, in violation of CFEPA, by refusing to provide him with a copy of his personnel file after his employment ended.  See Pl.'s Mem. at 22.  Retaliation claims under CFEPA mirror those under Title VII, and they too are subject to the McDonnell Douglas burden shifting framework.  See Ayantola v. Bd. of Tr. of Tech. Coll., 116 Conn. App. 531, 536 (2009). A prima facie case of retaliation under CFEPA requires a plaintiff to show (1) that he

---

[16] To the extent that Chima has argued KXT's refusal to provide his personnel record was "a continuation" of KXT's Denial, see Pl.'s Mem. at 17, it does not provide a basis to infer discriminatory intent.  Chima admitted in his deposition that he did not know of any other employee, white or otherwise, who had successfully received their records upon request.  See Chima Dep. at 176:23–25.  As such, no reasonable juror could find that Chima was treated less favorably than any other similarly situated employee based on the personal record denial.

participated in a protected activity; (2) that the defendant knew of the protected activity; (3) an adverse employment action; and (4) a causal connection between the protected activity and the adverse action.  McMenemy v. City of Rochester, 241 F.3d 279, 282–83 (2d Cir. 2001).

KXT argues that Chima's retaliation claim fails as a matter of law because, when Chima allegedly first requested his personnel record, he had not engaged in a protected activity that would have prompted KXT to retaliate by failing to provide the record. Def.'s Mem. at 33.  Because Chima asserts that he first requested his personnel record in mid-February 2020, he did not complain to anyone at KXT about racial discrimination or offensive comments before or after leaving KXT's employ, and he did not initiate his CHRO action until June 2020, KXT could not have known about his "protected activity" when it initially failed to provide his personnel record.  Id.  Chima's entire argument in response to KXT's Motion for Summary Judgment on this claim is provided below:

> The plaintiff's retaliation claim did not fail as a matter of law because the plaintiff was engaged in a protected activity before he allegedly requested a copy of his personnel file and the defendant refused to give him his personnel file as mandated by Conn. Gen. Stat. 563a § 31-128b because the plaintiff opposed the discriminatory act of the defendant.  The defendant refused to allow the plaintiff to work remotely but allowed Caucasian/white employees namely Christopher Thibeault, Robert Astle, and George Lauri to work remotely. The defendant refused to give the plaintiff his personnel file up until September 2, 2021—nineteen (19) months after the plaintiff was terminated and/or constructively discharged and fifteen (15) months after the plaintiff had filed his CHRO complaint on June 20, 2020.  There is clear evidence that the plaintiff opposed the defendant's discriminatory act or employment practice for the purpose of the CFEP [sic]. Since plaintiff can make out a prima facie case of retaliation in violation of the CFEPA, the defendant's summary judgment should be denied.

Pl.'s Mem. at 22–23 (internal citations omitted).

Section 31-128b of the Connecticut General Statutes expressly requires an employer to provide a personnel record within ten business days of a former employee's written request; it does not, however, designate the request of a personnel record as a "protected activity" under CFEPA.  See Conn. Gen. Stat. § 31-128b; see also Conn. Gen. Stat. § 46a-60(b) ("It shall be a discriminatory practice in violation of this section . . . for any  . . . employer . . . to discharge, expel, or otherwise discriminate against any person because such person has opposed any discriminatory employment practice or . . . filed a complaint [to the CHRO].").  The court is uncertain as to what "protected activity" Chima is referring in his argument above if not the filing of his complaint with the CHRO.  Moreover, Chima admits that KXT had no notice of this complaint when Chima first requested his employment file.  See Def.'s R. 56(a)1 Stmt ¶ 5; Pl.'s R. 56(a)2 Stmt. ¶ 5 ("Undisputed.").

Therefore, Chima has not come forward with any evidence upon which a reasonable juror could find that there was a causal connection between KXT's failure to provide Chima's personnel record in a reasonable time and Chima's protected activity of filing a complaint with the CHRO, and Chima's retaliation claim fails as a matter of law. The court grants KXT's Motion for Summary Judgment on Count Six of Chima's Third Revised Complaint.

## V.    CONCLUSION

For the reasons discussed above, KXT's Motion for Summary Judgment (Doc. No. 27) is granted.  The Clerk is directed to close the case.

**SO ORDERED.**

Dated at New Haven, Connecticut this 21st day of October 2022.


                     /s/ Janet C. Hall
                     Janet C. Hall
                     United States District Judge